IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BLUE HEN MECHANICAL, INC., | § | No. 589, 2014 |
| | § | |
| Plaintiff Below/Appellant, | § | Court Below:  Superior Court |
| | § | of the State of Delaware, |
| v. | § | in and for New Castle County |
| | § | |
| CHRISTIAN BROTHERS RISK | § | C.A. No. 12C-09-157 VLM |
| POOLING TRUST A/S/O LITTLE | § | |
| SISTERS OF THE POOR | § | |
| | § | |
| Defendant Below/Appellee. | § | |
| | § | |

Submitted:  June 10, 2015
Decided:  June 15, 2015

Before **STRINE**, Chief Justice; **HOLLAND** and **VAUGHN**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Kevin W. Gibson, Esquire, Gibson & Perkins, P.C., New Castle, Delaware, for Appellant.

Bruce W. McCullough, Esquire, Bodell Bové, LLC, Wilmington, Delaware, for Appellee.

**STRINE**, Chief Justice:

# I.  INTRODUCTION

This is a regrettable case.  In the name of controlling litigation costs, a heating and air conditioning contractor ("Blue Hen") sued Christian Brothers Risk Pooling Trust as subrogee for the Little Sisters of the Poor ("Little Sisters of the Poor") for malicious prosecution.  The supposedly malicious cause of action concededly arose out of a real problem for the Little Sisters of the Poor.  In January 2008, the Little Sisters of the Poor contracted with Blue Hen to maintain the heating, ventilation, and air conditioning equipment at its nonprofit residential nursing home facility.  Two months later, the nursing home's air conditioner broke, requiring the unit to be replaced at a cost of $168,740.  The Little Sisters of the Poor filed suit against Blue Hen, alleging that the unit's failure was due to Blue Hen's negligence in inspecting and maintaining the equipment.  After briefing and oral argument, the Superior Court determined that the Little Sisters of the Poor had not produced sufficient evidence of Blue Hen's negligence, and granted Blue Hen's motion for summary judgment.[1]

Rather than seek its costs in that lawsuit, or simply accept its trial victory, Blue Hen initiated another suit against the Little Sisters of the Poor, alleging malicious prosecution and abuse of process.  Blue Hen concedes that the Little Sisters of the Poor initially had good cause to sue.  But it contends that during the course of that litigation, the Little Sisters of the Poor should have realized that its suit lacked probable cause, and accordingly dismissed its claims against Blue Hen.  Although Delaware courts have

---

[1] *See* App. to Opening Br. at 29 (*Christian Bros. Risk Pooling Trust a/s/o Little Sisters of the Poor v. Blue Hen Mech., Inc.*, C.A. No. 09C-08-054 CHT (Del. Super. Feb. 3, 2012) (opinion and order granting summary judgment)) [hereinafter Summary Judgment Order].

1

historically determined that claims for malicious prosecution must involve lack of probable cause at the beginning of litigation, Blue Hen urged the Superior Court "to make law" and extend the tort to punish plaintiffs who continue litigation without probable cause.

The Superior Court refused to enlarge the tort of malicious prosecution, which has historically been disfavored by Delaware courts, and determined that under the tort as our courts have defined it, Blue Hen failed to demonstrate that the Little Sisters of the Poor acted maliciously in bringing its action. The Superior Court similarly rejected Blue Hen's abuse of process claim. The Superior Court thus granted summary judgment to the Little Sisters of the Poor.

We now affirm the judgment of the Superior Court. Whatever the original wisdom for sanctioning the tort of malicious prosecution, we refuse to extend it to encompass claims properly brought before the court in the first instance. As important, there is no basis in the summary judgment record to support a rational jury finding that the Little Sisters of the Poor acted maliciously in the original suit, rather than in a good faith belief that Blue Hen was responsible for the serious losses that the Little Sisters of the Poor had suffered.

## II.    BACKGROUND

For many years before the events giving rise to this suit, the Little Sisters of the Poor relied on Thomas Hoback to repair and maintain the HVAC systems in their nonprofit nursing home facility, the Jeanne Jugan Residence located in Newark, Delaware. The Residence serves 80 low-income residents, consistent with the Little

2

Sisters of the Poor's mission to care for the elderly poor.[2]  In January 2008, when Hoback went to work for Blue Hen, he brought the Little Sisters of the Poor's account with him. On January 25, the Little Sisters of the Poor signed a contract with Blue Hen to inspect and maintain the facility's heating, ventilation, and air conditioning equipment, including a Carrier Model 30GX packaged Air Cooled Chiller (the "Chiller") installed in 1999. The contract provides, in relevant part, that the parties' agreement "covers all labor necessary for the routine inspection, maintenance, and repair of all the HVAC equipment including evening and holiday emergency services."[3]  The contract also sets forth a "Scope of Maintenance Schedule," under which Blue Hen agreed to perform "inspection of the Carrier Chiller (seasonal) for proper operation," including "supply and return temperature of chiller water."[4]

According to a demand letter the Little Sisters of the Poor later sent to Blue Hen, the Chiller was placed on idle mode from October through April, and during that period, Blue Hen's responsibility under the contract was to inspect the unit once a week to ensure it was continuing to function.[5]  Roughly a month after the contract was signed with Blue Hen, on March 3, 2008, Blue Hen's technician was conducting his required weekly inspection of the Chiller when he realized that something was wrong with the unit.  The technician determined that a pipe had frozen and burst, which let water into the unit, causing the system to fail.  The Chiller's computer monitoring system noted that the

---

[2] *See* Our Home, http://www.littlesistersofthepoordelaware.org/our-home (last visited June 4, 2015).
[3] App. to Opening Br. at 26 (Demand Letter from Maureen A. Hughes, dated July 7, 2008).
[4] *Id.*
[5] *Id.* at 25.

failure occurred on February 19, 2008, roughly two weeks before the Blue Hen technician observed a problem. Blue Hen informed the Little Sisters of the Poor that the damage to the Chiller was not reparable, and it needed to be replaced with a new unit at a cost of $168,740, no small sum to the nonprofit Little Sisters of the Poor.

The nursing home's maintenance supervisor, J.B. Rorabaugh, determined that Blue Hen was responsible for the Chiller's failure. In a sworn statement of proof of loss submitted to the Little Sisters of the Poor's insurer, Christian Brothers Risk Pooling Trust, Rorabaugh opined that the Chiller failed due to Blue Hen's negligence in maintaining the unit because it "did not set up system properly for winter conditions."[6] At some point before the Little Sisters of the Poor initiated its lawsuit against Blue Hen, Rorabaugh reversed himself, and determined that the failure was due to a mechanical design flaw rather than any fault of Blue Hen's.[7]

In addition to Rorabaugh's opinion, the Little Sisters of the Poor engaged two engineering experts to inspect the broken Chiller for the purpose of determining liability. Both experts determined that the failure was a result of negligent inspection and maintenance.[8] In their view, the earlier failure by Hoback—who Blue Hen brought on board and used to secure the contract with the Little Sisters of the Poor—to shut the Chiller down properly for the winter was not the primary reason for the unit's failure. That is, even if the unit had not been properly shut down for the winter before the Little

---

[6] Answering. Br. at 6.
[7] *See* App. to Opening Br. at 288 (Def. Christian Bros. Opening Br. in Support of its Motion for Summary Judgment).
[8] *See* App. to Opening Br. at 222 (Dep. Testimony of James L. Baker).

Sisters of the Poor signed its contract with Blue Hen, the experts opined that Blue Hen's required weekly inspections should have revealed any issues related to the improper shut-down, and it was this negligence that ultimately led to the Chiller's failure.[9]

Specifically, in its demand letter, the Little Sisters of the Poor contended that the damage to the Chiller was a result of Blue Hen's failure to install a flow meter "to properly evaluate the condition of the equipment."[10] In layman's terms, the Little Sisters of the Poor alleged that Blue Hen, as a sophisticated mechanical contractor, should have known to monitor both the water flow and temperature, and had it done so, it would have realized that there was a problem with the Chiller, and made sure it was fixed before it broke beyond repair. Although Blue Hen had monitored the water temperature in the unit, it had not monitored the water flow, in part because the temperature gauges in the machine itself were insufficient to determine if water was flowing properly in the unit. The Little Sisters of the Poor's experts determined that it was a problem with the flow of water, not the temperature, that caused the system to break down.

On that basis, the Little Sisters of the Poor brought suit against Blue Hen in Superior Court, alleging breach of contract and negligence, and seeking $168,740 in damages for the Chiller's replacement value.[11] Although the Little Sisters of the Poor

---

[9] *See id.* at 235.
[10] *Id.* at 26-27.
[11] *See* App. to Opening Br. at 21 (Complaint, dated Aug. 6, 2009).

secured two expert opinions before initiating suit, it chose to rely upon only one of them, the expert report prepared by engineer Paul L. Dreyer, in the case.[12]

When Blue Hen moved for summary judgment, it argued that the Little Sisters of the Poor had failed to demonstrate that Blue Hen was negligent in maintaining the Chiller. Blue Hen contended that Dreyer's expert report failed to define Blue Hen's duties under the contract, including the requirements for inspection and maintenance of the Chiller. Alternatively, Blue Hen alleged that it was not responsible for the unit's failure because it was not obligated to conduct a seasonal inspection under the contract until April, when the unit would be restarted in preparation for the summer months.[13]

Blue Hen relied on its own engineering expert, Robert Kostival, who opined that Blue Hen was not responsible for the Chiller's failure because any liability for installation or design defects should be attributed to the firm who installed the unit in 1999, long before the Little Sisters of the Poor signed its contract with Blue Hen. Kostival also noted that the contractual requirement for seasonal inspection had not yet been triggered at the time of the unit's failure, and "therefore, any service provided would not have contributed to the Carrier Chiller's failure."[14] In other words, Blue Hen essentially assigned blame for the Chiller's failure to its own technician, Hoback, for any issues that arose before he brought the Little Sisters of the Poor's account with him when he began working for Blue Hen, and discounted its own contractual responsibility to

---

[12] *See* App. to Opening Br. at 368 (Tr. of Motions, Oct. 30, 2014) ("And, so, for reasons that I'm not aware of because I wasn't in that case, the boiler company expert opinion never came in.").
[13] *See* Summary Judgment Order at 5.
[14] *Id*. at 4.

identify any underlying issues during the five or six weekly inspections that took place between the date the contract was signed and the date the technician discovered the problem.

After oral argument on Blue Hen's motion for summary judgment, the Little Sisters of the Poor recognized that its first expert report was deficient in form and asked for additional time to file a supplemental report. The Little Sisters of the Poor argued that it had a good faith basis to claim that Blue Hen had been negligent and thus owed damages. Blue Hen objected and claimed that the Little Sisters of the Poor had long been aware that its expert report was deficient and therefore lacked good cause to amend the scheduling order deadline.[15]

The Superior Court issued an order and opinion on February 3, 2012, granting Blue Hen's motion for summary judgment and denying the Little Sisters of the Poor's request to amend the scheduling order to obtain a supplemental export report. The Superior Court agreed with Blue Hen that Dreyer's expert report was insufficient to establish that Blue Hen was responsible for the Chiller's failure:

> Mr. Dreyer identified reasons why the Carrier Chiller failed, however, he did not identify or associate any conduct by the Defendant with that failure. Nor did he define the applicable standard of care, or whether a breach of that standard by the Defendant was the proximate cause of the loss as suffered by the Plaintiff.[16]

---

[15] *See id*. at 6-7.
[16] *Id*. at 3-4.

The Superior Court also determined that the Little Sisters of the Poor's breach of contract claim failed because "the Defendant's contractual responsibilities had not begun at the time of the loss."[17]

Finally, the Superior Court denied the Little Sisters of the Poor's request to amend the scheduling order and submit a supplemental affidavit from its expert. The Superior Court noted that the Little Sisters of the Poor "was aware of the problematic nature of Mr. Dreyer's testimony before the discovery deadline had elapsed yet did not take any action in that regard prior to oral argument."[18] As a result, the Superior Court granted Blue Hen's motion for summary judgment on the Little Sisters of the Poor's breach of contract and negligence claims.

Nonetheless, for reasons that are unclear from the record, the Little Sisters of the Poor commissioned a supplemental expert report in the form of an affidavit from its expert, Paul L. Dreyer, which it provided to Blue Hen after the Superior Court issued its summary judgment order. Dreyer's affidavit, dated May 24, 2012, observed that Blue Hen not only failed to recommend installing equipment that would have enabled it to monitor the unit's water flow more effectively, but also failed to "use other means to determine the amount of water flowing into the chiller's evaporator."[19] Dreyer asserted that the Chiller's problem was not merely mechanical: "A reasonably prudent maintenance technician in the same, or similar, position as the Blue Hen Mechanical technician would have, and should have, absolutely verified, first, that there was a

---

[17] *Id*. at 11.
[18] *Id*. at 13.
[19] *Id*. at 143.

8

sufficient flow of water within the chiller to prevent the freeze burst failure." He then concluded:

> In my opinion, to a reasonable degree of engineering certainty, . . . Blue Hen Mechanical's failure to comply with the reasonable standard of care for chiller maintenance technicians in the same, or similar, position as Blue Hen Mechanical in and around February 19, 2008, directly caused and/or substantially contributed to the chiller failure that was discovered on February 19, 2008.[20]

Given that the affidavit plainly addresses the Superior Court's concern in the original case, we conclude that it would have been sufficient to defeat the contractor's summary judgment motion in the original action had it been available.

Despite that affidavit, and its clear indication of the good faith basis for the Little Sisters of the Poor's suit against Blue Hen, Blue Hen filed a new lawsuit in November 2012 against the Little Sisters of the Poor for malicious prosecution and abuse of process.[21] In seeking summary judgment before the Superior Court in the earlier case, Blue Hen had not sought to hold the Little Sisters of the Poor responsible for litigating in bad faith. Thus, it sought no award of fees in connection with the summary judgment motion, and did not contend that the Little Sisters of the Poor had unfairly imposed litigation costs without a good faith basis to resist summary judgment. Rather, Blue Hen was apparently content in the original action to take its victory and move on. But nine months after the Superior Court granted its summary judgment motion, Blue Hen decided to initiate a separate legal action.

---

[20] App. to Opening Br. at 145 (Dreyer Affidavit, May 24, 2012).
[21] *See* App. to Opening Br. at 51 (Complaint).

9

In its complaint, Blue Hen alleged that the Little Sisters of the Poor's allegations in its original pleadings "had no reasonable basis and lacked probable cause."[22] Blue Hen also claimed that the Little Sisters of the Poor's "sole purpose in bringing the charges of breach of contract and negligence . . . was to file such an action with malice aforethought so as to vex [Blue Hen] and extort [Blue Hen] into replacing the 'Chiller' unit . . . ."[23] Blue Hen asserted that the Little Sisters of the Poor's "bringing of said action was a willful and malicious act in the use of judicial process for an ulterior purpose not proper in the regular conduct of the proceedings . . . ."[24] As a result, Blue Hen sought compensatory damages, punitive damages, and costs.

The Little Sisters of the Poor moved to dismiss the complaint. Relying on venerable case law that has rarely been cited or used because very few malicious prosecution actions have been filed in our courts, the Superior Court denied the motion and allowed the case to proceed.[25]

During the discovery phase, Blue Hen deposed James L. Baker, the director of risk and claims services for Christian Brothers.[26] Baker clarified that the Little Sisters of the Poor had engaged two experts, including Dreyer, both of whom opined that Blue Hen was responsible for the Chiller's failure. Baker also explained why he gave more weight to the view of the two experts than to Rorabaugh, who had originally agreed that Blue

---

[22] *Id*. at 52.
[23] *Id*.
[24] *Id*. at 53.
[25] App. to Opening Br. at 119 (Opinion and Order Regarding Defendant's Motion to Dismiss the First Amended Complaint, dated April 1, 2013).
[26] App. to Opening Br. at 210 (Dep. Testimony of James L. Baker).

Hen's negligence caused the Chiller's failure but then claimed to have changed his mind. Baker opined that the two "engineering experts were more qualified . . . to make a decision on the cause of the damage to the equipment in question rather than [Rorabaugh's] opinion that it was a mechanical failure rather than a maintenance failure."[27] He also contended that, based on those expert opinions, he believed Blue Hen was negligent because it "should have discovered that the unit was not shut down properly in the fall and that it was susceptible to freeze."[28]

The Little Sisters of the Poor also produced a letter from its own attorney,[29] explaining why it had a good faith belief that Blue Hen was responsible in damages for the Chiller's failure. In that letter, the attorney stated that:

> After the chiller failure, [Christian Brothers] began an immediate investigation. During this investigation, [Christian Brothers] employed the assistance of a mechanical engineering consultant, Paul L. Dreyer. It has been, and continues to be, the opinion of Paul L. Dreyer that the technician employed by Blue Hen Mechanical, assigned to maintain the subject chiller for the Little Sisters of the Poor, failed to take the necessary steps that a reasonably prudent technician in the same or similar position would have done, leading to the chiller failure on February 19, 2008. . . .
>
> While the court in the underlying action granted Blue Hen Mechanical's motion for summary judgment, the court's decision in no way substantiates Blue Hen's threatened malicious prosecution case. In fact, we believe our expert provided the requisite opinions to establish a case against Blue Hen Mechanical within his written report and deposition testimony, despite the court's ruling.[30]

---

[27] App. to Opening Br. at 223-24 (Dep. Testimony of James L. Baker).
[28] *Id*. at 235.
[29] Michael Airdo is the national coordinating counsel for Christian Brothers Risk Pooling Trust, which was responsible for engaging Paul Dreyer as the expert engineering consultant. *See* App. to Opening Br. at 147 (letter from Michael Airdo).
[30] *Id*.

After discovery ended, both parties moved for summary judgment. Blue Hen conceded at oral argument that the Little Sisters of the Poor had good cause to file suit in the first place, but contended that at some time during the summary judgment proceedings, it came to lack good cause and thus its actions in resisting summary judgment were "malicious."[31] Blue Hen argued that even though Delaware courts have never recognized a claim for malicious prosecution when the litigant had a good faith reason to bring the initial claim, Delaware should extend the tort to situations in which a party continues to pursue litigation after determining it no longer has a good faith basis to do so. In pressing that point, Blue Hen primarily relied on the Restatement (Second) of Torts and the law of Pennsylvania, which permits claims for malicious prosecution based on pursuing a claim without probable cause regardless of the litigant's good faith at the beginning of the litigation.[32]

In response, the Little Sisters of the Poor argued that the Superior Court should not extend the case law in Delaware recognizing a claim for malicious prosecution beyond its narrow scope. The Little Sisters of the Poor also argued that it had produced undisputed evidence of record that indicated it had a good faith basis for holding Blue Hen liable for the Chiller's malfunction. Given that reality, the Little Sisters of the Poor argued that Blue Hen did not have a triable claim that the Little Sisters of the Poor had acted maliciously or abused the litigation process. In essence, the Little Sisters of the Poor argued that Blue Hen sought to punish it doubly for its failure to put together an effective

---

[31] App. to Opening Br. at 314; 324 (Tr. of Motions, Oct. 30, 2014).
[32] *See id*. at 317.

12

and timely expert report in the initial lawsuit. Not content with having the Little Sisters of the Poor's case dismissed on that basis, Blue Hen also wanted damages through a separately-filed action.

Following argument, the Superior Court granted the Little Sisters of the Poor's motion and denied Blue Hen's motion for summary judgment from the bench because it determined that "there is no evidence of malice in [the Little Sisters of the Poor's] decision to pursue the prior litigation."[33] The court also refused to expand the tort of malicious prosecution to include a litigant who proceeds without probable cause when it had probable cause to initiate suit:

> And while I appreciate the fact that there is case law that may support that in other jurisdictions for a claim of malicious prosecution, I think the case law is very clear as to the elements of the claim for malicious prosecution that need to be met here, and . . . if there is no evidence or no factual issue in dispute that would support a claim for the element of malice and/or probable cause, especially malice in instituting the former proceedings, then I do believe that the defendant is entitled to summary judgment on the malicious-prosecution claim.[34]

Blue Hen has now appealed to this Court, alleging that Delaware should recognize claims for malicious prosecution based on the wrongful continuation of proceedings after probable cause no longer exists and, if we do, it is entitled to a judgment that the Little Sisters of the Poor acted maliciously in pursuing the earlier action. In its opening brief,

---

[33] *Id*. at 371.
[34] *Id*. at 371-72.

Blue Hen did not detail any arguments related to abuse of process, and its claim is therefore deemed waived.[35]

## III.   ANALYSIS

We agree with the Superior Court that there is no reason to extend the tort of malicious prosecution beyond the limited scope given to it by long-standing Delaware case law,[36] and many reasons to reject Blue Hen's invitation for us to do so.  Moreover, we agree with the Superior Court that there is no basis in the record from which a fact-finder could conclude that the Little Sisters of the Poor initiated its lawsuit against Blue Hen with malice.

We explain each reason in turn.

First, the case law that Blue Hen cites regarding the tort of malicious prosecution is dusty from lack of use.[37]  And we believe that it is a good thing.  It has long been the case that our trial courts were empowered to shift fees under the bad faith exception to

---

[35] *See* Supr. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal.").

[36] *See, e.g.*, *Nix v. Sawyer*, 466 A.2d 407, 411 (Del. Super. 1983) (citing *Kaye v. Pantone, Inc.*, 395 A.2d 369 (Del. Ch. 1978)) ("With respect to the cause of action for malicious prosecution, such a claim is viewed with disfavor by the Delaware courts, and, therefore, assessed with careful scrutiny."); *see also Cuccia v. Edinburg*, 1984 WL 548380, at *2 (Del. Super. Jan. 10, 1984) ("It appears that the Court in *Kaye v. Patone, Inc.*, has indicated a recognition of the English Rule for Delaware rather than the Restatement Rule as set out in Restatement (Second) of Torts. . . .") (internal citations omitted); *Wells v. Parsons*, 3 Del. 505, 506 (Del. Super. 1842) (determining that a plaintiff in a malicious prosecution suit "is bound to prove-1st. That there was a prosecution. 2d. That it terminated in favor of the plaintiff. 3d. That the defendant was the prosecutor. *4th. That he was actuated by malice.* 5th. That there was a want of probable cause. 6th. The damages that plaintiff has sustained") (emphasis added).

[37] *See* Opening Br. at 9 (citing *Megenhardt v. Nolan*, 1990 WL 169009 (Del. Oct. 18, 1990)); *see also id.* at 16 ("As far as Blue Hen is able to discern, the issue presently before this Court has not arisen in the roughly 170 years since *Wells*.").

14

the American rule if a claim was asserted frivolously in the first instance.[38]  Thus, even at

the pleading stage, a defendant who feels it has been sued without a good faith basis can

seek its fees and costs for getting a complaint dismissed successfully.[39]  Furthermore, the

rules of the Superior Court and other trial courts give trial judges the discretion to strike

scandalous allegations that bear no relevance to the claim being asserted and are made

solely to put improper pressure on the defendant.[40]  In granting such a motion, the trial

court retains the discretion to shift fees and impose sanctions for the improper conduct.[41]

In the important context of discovery, the Superior Court's rules provide as a

default that a party who prevails in seeking a protective order or obtaining a motion to

compel is entitled to its fees and costs in securing that order, on the intuition that when a

party is forced to seek relief from the court in that context, its litigation costs have been

---

[38] *See, e.g.*, *Slawik v. State*, 480 A.2d 636, 639 n.5 (Del. 1984) ("We recognize the inherent power in the courts to allow attorneys' fees in particular situations, *e.g.*, the willful disobedience of a court order '. . . as part of the fine to be levied on the defendant,' or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .'") (internal citations omitted).

[39] *See, e.g.*, *Beck v. Atl. Coast PLC*, 868 A.2d 840 (Del. Ch. 2005) (granting defendant's motion to dismiss and awarding attorneys' fees and costs to the defendant because the plaintiff brought a frivolous action in bad faith).

[40] *See* Super. Ct. Civ. R. 12(f) ("Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these Rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the Court's own initiative at any time, the Court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."); Ct. Ch. R. 12(f) (same).

[41] *See, e.g.*, Super. Ct. Civ. R. 11(c) (permitting the Superior Court to impose sanctions, including if a party files a motion or pleading for an improper purpose, "such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," either on a motion by the other party or on the Court's own initiative ); Ct. Ch. R. 11(c) (permitting the Court of Chancery to do the same).

15

raised above what they would have been had the other side acted reasonably.[42] And the

bad faith exception to the American Rule may be used by a party who has been subjected

to improper litigation conduct by its adversary at any time in the litigation, not just the

pleading stage.[43] As a result, there are many decisions of this Court affirming trial

judges' exercises of discretion to award attorneys' fees and costs to the prevailing party,

when that party has been harmed by bad faith conduct by its litigating adversary.[44]

At the same time, of course, the bad faith exception remains an exception to the

general rule, which is that parties bear their own fees and expenses.[45] Although other

---

[42] *See* Super. Ct. Civ. R. 37(b) ("If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery . . . the Court may make such orders in regard to the failure as are just. . . . In lieu of any of the foregoing orders or in addition thereto, the Court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the Court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.").

[43] *See, e.g.*, *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998) ("The bad faith exception is not limited to the circumstances where the action is brought in bad faith or where the defendants' bad faith forces the filing of the action. It also includes cases where the litigation process itself is conducted in bad faith."); *cf.* 35B C.J.S. *Federal Civil Procedure* § 1400 (describing the analogous exception to the American Rule in federal courts as "not restricted to a case where an action is filed in bad faith. Bad faith may be found not only in actions that lead to a lawsuit but also in the conduct of the litigation so that while the presence of merit in a claim or defense may negate any finding of bad faith in the filing, it cannot justify abuse of the judicial process in the method of prosecution").

[44] *See, e.g.*, *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del. 2012) (affirming Court of Chancery's award of attorneys' fees to plaintiffs because of defendants' bad faith conduct "throughout the course of the trial"); *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 508 (Del. 2005) (affirming Court of Chancery's award of attorneys' fees to defendant as a result of plaintiff's bad faith conduct in bringing suit and its "outrageous and unacceptable" conduct throughout the litigation process); *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542 (Del. 1998) (affirming Court of Chancery's award of attorneys' fees to plaintiffs in light of defendants' bad faith conduct).

[45] *See Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 880 (Del. Ch. Feb. 23, 2012), *aff'd sub nom*, *Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012) ("Under the

16

courts have made other choices, including the legal regime of our English friends, American courts historically have adhered to the theory that the right to litigate should not be hampered by an invariable shifting of fees and costs to the loser.[46] The rule is premised on the idea that automatic fee-shifting will dissuade litigants, particularly those with limited resources, from bringing viable claims for fear of having to pay the other parties' fees and costs if they lose for any reason.[47] The bad faith exception tempers that approach by recognizing that when a litigant imposes unjustifiable costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct.[48] Given the viability of the bad faith exception to the American rule, we believe that there is no justification for extending the tort of malicious

---

American Rule, each party is ordinarily responsible for its own litigation expenses. But, this court has discretion to shift attorneys' fees and costs when a party to the litigation has acted in bad faith. The bad faith exception is not 'lightly' invoked. Rather, the party seeking fee shifting must show by 'clear evidence' that the party from whom fees are sought has acted in subjective bad faith.").

[46] Thomas D. Rowe, Jr., *The Legal Theory of Attorney Fee Shifting: A Critical Overview*, 1982 DUKE L.J. 651 (1982) ("The English routinely include an assessment for a reasonable attorney's fee in the costs to be borne by a losing party; the usual rule on the Continent is similarly to assess the loser for at least part of the winner's attorney fees.").

[47] *See Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967) ("In support of the American rule, it has been argued that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel."); 20 C.J.S. *Costs* § 137 ("The purposes behind the American Rule include unrestricted access to the courts for all persons, ensuring equity by not penalizing persons for exercising their right to litigate a dispute, even if they lose, and administrative convenience.").

[48] *Brice v. State, Dep't of Correction*, 704 A.2d 1176, 1179 (Del. 1998) ("The purpose of this exception is not to award attorney's fees to the prevailing party as a matter of right, but rather to 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'") (internal citation omitted); *cf.* 35B C.J.S. *Federal Civil Procedure* § 1400 ("The bad-faith exception to the 'American Rule' comes directly from the court's inherent authority to sanction willful violations of its rules.").

prosecution that would outweigh the obvious costs such an extension would impose on our system of justice.[49]

Blue Hen's proposal would create the least efficient and least just approach to addressing alleged bad faith conduct. Instead of requiring litigants to present a timely motion for fee shifting and sanctions to the judge who already understood the issues and the parties involved, Blue Hen would have us extend the contours of a tort—in the name of deterring excessive litigation costs—to encourage litigants feeling victimized by undignified litigation conduct to file a new suit, likely before a new judge. And, even if the same judge who heard the original litigation that was supposedly tainted by malice heard the second suit, she would need to revive her memory and knowledge of the record at that later date.

Not only that, there would be extra costs for all concerned because of the filing of a new suit, the reengagement of counsel, and the extra costs that always come from relearning complex material. For example, by prosecuting its malicious prosecution claim, Blue Hen has almost certainly increased its own costs well above what they would have been had it simply lived with its victory in the previous litigation, or if it felt some recompense was required, filed a motion to shift some reasonable amount of fees in the original litigation. Instead of doing either, Blue Hen was silent during the underlying litigation, then filed an entirely new action. This required a second judge of our busy

---

[49] *See Nevins v. Bryan*, 2005 WL 2249520, at *1 (Del. Super. Sept. 8, 2005), *aff'd*, 2006 WL 1375062 (Del. May 18, 2006) (quoting *Alexander v. Petty*, 108 A.2d 575, 577 (Del. Ch. 1954)) ("Actions for malicious prosecution are viewed with disfavor by the law 'because of their undesirable tendency to unduly discourage citizens from seeking redress in the courts.'").

Superior Court to grapple with many of the issues in the original case anew, and required the Little Sisters of the Poor to expend additional funds in generating evidence and responding to Blue Hen's claims. The recognition of a claim like this also encourages what can only be fairly termed sandbagging. Most trial judges require parties seeking fee shifting to do so promptly during the litigation itself if they believe that bad faith conduct has occurred. The reasons for that are similar to those just articulated; the most efficient and fair way to address bad faith conduct is to do so promptly.

Put simply, we see no empty compartment in the tool box that trial judges have to address bad faith litigation conduct that would be filled by usefully extending the malicious prosecution tort.

Equally important, this case itself provides no reasonable ground for extending the tort of malicious prosecution. The Superior Court correctly granted summary judgment to the Little Sisters of the Poor because Blue Hen presented no evidence from which a reasonable jury could find that the Little Sisters of the Poor had proceeded maliciously at any time in the previous litigation. Malicious prosecution does not involve litigating a case about which reasonable minds might differ. To be tautological, malicious prosecution requires evidence of actual malice, in the sense of an improper motive or "wanton disregard of the rights of that person against whom the act is directed."[50]

However counterintuitive our finding might seem, nothing in the summary judgment record supports any inference that the Little Sisters of the Poor harbored malice in their hearts when they sued Blue Hen. The fact that Rorabaugh, the head of

---

[50] *Stidham v. Diamond State Brewery*, 21 A.2d 283, 285 (Del. Super. 1941).

maintenance for the Little Sisters of the Poor's nursing home, recanted his original opinion that Blue Hen was responsible for the Chiller's failure would not support a rational jury finding of malice. Even if Rorabaugh's later opinion was his real one—itself a jury question—Blue Hen has not explained how a jury could find malice given the Dreyer affidavit and the letter from the Little Sisters of the Poor's counsel produced during this litigation. These documents persuasively indicate why there was a good faith basis for the Little Sisters of the Poor to allege, and a jury to find, that Blue Hen breached its contract in negligently failing to inspect and maintain the Chiller.

The mere fact that Blue Hen benefited because the Little Sisters of the Poor did not introduce these documents into the original proceeding in time does not come close to supporting its claim that the Little Sisters of the Poor maliciously pursued litigation against Blue Hen. In fact, the Little Sisters of the Poor sought to cure the problem with the Dreyer affidavit in the original action, but the Superior Court refused to allow it to do so, upholding Blue Hen's objection that it was important that the parties adhere to the litigation schedule. These circumstances underscore why the prompt invocation of the trial judge's discretion to shift fees is the more precise and effective tool to use than a separate malicious prosecution action.

Had Blue Hen sought fees for its supposedly excess costs before the original trial judge, the issue could have been evaluated promptly and at lower cost. Blue Hen may have been put to a choice, to accept its summary judgment victory or to allow the Little Sisters of the Poor to file a supplemental affidavit. Had the Little Sisters of the Poor been allowed to file a supplemental affidavit from its expert, Blue Hen may have been

20

awarded its costs of taking any additional deposition testimony of the expert or for having its own expert respond to the new material. In other words, the original trial judge would have been able to mete out immediate, proportionate, and cost-effective justice.

By failing to use the tools available to it, and instead filing a later tort action alleging that the Little Sisters of the Poor acted maliciously, Blue Hen has drawn out the parties' dispute, caused one of our important trial courts to use up more of its scarce time, and likely greatly increased both its own and certainly the costs of the Little Sisters of the Poor. That Blue Hen has done so in the name of controlling litigation costs makes this case all the more regrettable.

We therefore affirm the judgment of the Superior Court dismissing Blue Hen's claim.