# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE DISSOLUTION OF JEFFCO MANAGEMENT, LLC | ) ) ) ) | C.A. No. 2018-0027-PAF |

## MEMORANDUM OPINION

Date Submitted: May 19, 2021
Date Decided: August 16, 2021

Jason C. Powell, THE POWELL FIRM, LLC, Wilmington, Delaware; *Receiver for Jeffco Management, LLC*.

S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorney for Petitioner Jeffrey Miller*.

John G. Harris, BERGER HARRIS LLP, Wilmington, Delaware; James Nealon, WITHERS BERGMAN LLP, New York, New York; *Attorneys for Respondent Jeffrey S. Tabak*.

FIORAVANTI, Vice Chancellor

This dispute involves the dissolution of a two-member limited liability company, whose sole asset is an indirect majority ownership interest in a municipal bond broker-dealer business. After decades of doing business together, the relationship between the two members fell apart. Their equally owned LLC became deadlocked, and the court ordered that the LLC be dissolved. When the members failed to reach consensus on how to wind up the company's affairs and one member began diverting distributions owed to the other member, the court appointed a receiver to effectuate the dissolution. The receiver spent the next several months engaging with the members and reviewing the company's finances. He concluded that one member had a positive capital account balance while the other member's balance was negative. As permitted under the operative LLC agreement, the receiver proposed an in-kind distribution of the company's assets to the first member. Predictably, the second member objected to this plan. The objecting member asserted that he had a claim against the company for reimbursement of the subsidiary's operating expenses and that the receiver discredited over $1 million in capital contributions that this member had previously made, among other objections.

Upon initial review of the receiver's proposed plan of distribution and the two principal objections, the court decided to hold a limited evidentiary hearing. The objecting member and the LLC's longtime accountant testified at the hearing. In this memorandum opinion, after considering the evidence and testimony presented,

the court overrules the objections and confirms the receiver's proposed plan of distribution and dissolution.  The court also decides the non-objecting member's motion for fee shifting.

## I.  FACTUAL BACKGROUND[1]

Jeffco Management, LLC ("Jeffco" or the "Company") is a Delaware limited liability company formed for the purpose of operating a broker/dealer business.[2] Jeffco is governed by a Limited Liability Company Agreement dated October 2001 (the "LLC Agreement").[3]  Jeffco has two equal managing members, Jeffrey Miller and Jeffrey Tabak (together, the "Members").[4]  Jeffco owns 88.12% of MTCO LLC ("MTCO"), a New York limited liability company, and serves as its managing member.[5]  The remaining 11.88% of MTCO is held by four other members.[6]  MTCO

---

[1] The factual background comes primarily from the evidentiary hearing held on April 20, 2021 (cited as "Tr." followed by the transcript page and line number) and the joint hearing exhibits submitted therewith (cited as JX followed by the Bates number).

[2] Verified Petition for Judicial Dissolution ¶ 1; *see also* Receiver's Motion to Approve Plan of Distribution and Dissolution for Jeffco Management, LLC and for Related Relief ("Motion to Approve") ¶ 4(a).

[3] The LLC Agreement is JX 61.

[4] Receiver's Motion to Approve ¶ 4(b); LLC Agreement, Ex. A.

[5] Tr. 14:1–2.

[6] Tr. 14:3–5.

owns 75% of Miller Tabak Asset Management, LLC ("MTAM").[7] Michael Pietronico is the COO and the other 25% owner of MTAM.[8]

MTAM is a registered investment advisor that manages municipal bond money for individuals.[9] As an operating company, MTAM has various expenses. These include salaries for its employees; retention bonus payments to Pietronico; bills from its accountants at Citrin Cooperman & Company LLP ("Citrin Cooperman"); and rental payments for its office on Park Avenue in Manhattan.[10] The arrangement for paying these expenses is complicated and disputed. Tabak asserts that MTCO is obligated to pay MTAM's operating expenses.[11] Tabak suggests that at least part of this obligation arises from a provision in an operating agreement, but Tabak could not identify the operating agreement or the specific provision.[12] Tabak also asserts that MTCO agreed to pay certain MTAM expenses pursuant to an unwritten side agreement with Pietronico that Miller orchestrated.[13] For his part, Miller represented to the Receiver that he arranged for MTAM's expenses to be covered by another related entity, Miller Tabak + Co., LLC ("Miller

---

[7] Tr. 13:21–24.

[8] *Id.*

[9] Tr. 13:12–20.

[10] Tr. 16:7–17; Tr. 18:10–21; JX 37 § 3.3.

[11] Tr. 16:18–17:2.

[12] *Id.*; Tr. 129:5–130:13.

[13] JX 54 at '491; Tr. 127:14–128:11; Tr. 130:14–131:4.

Tabak + Co.").[14]  Miller Tabak + Co. has no operations, but Tabak contributes to Miller Tabak + Co. the commissions he receives through his job as an independent contractor at Lek Securities.[15]  In practice, because a recent decline in MTAM's profitability has made it difficult for MTCO to pay expenses out of MTAM's passed-through profits, Tabak has used funds from Miller Tabak + Co. to pay MTAM's operating expenses.[16]

In April 2017, Miller ceased participating in the business.[17]  That month, Tabak started covering MTAM's expenses out of the funds he contributed to Miller Tabak + Co.[18]  Tabak alleges that Miller is equally responsible for all these payments, and Tabak has kept a running tally of Miller's share.[19]  As discussed below, Tabak has regularly sent Miller letters informing him of his increasing liability.  As of March 31, 2021, Tabak alleges that he has paid approximately $136,000 of MTAM's operating expenses and that Miller personally owes approximately $68,000 for his share of the expenses.[20]

---

[14] JX 30.  MTCO is made up of partners from Miller Tabak + Co.  *Id.*

[15] Tr. 40:18–41:19.

[16] *Id.*; Tr. 22:11–15.

[17] Tr. 21:9–19.

[18] Tr. 18:10–19:12.

[19] JX 76.

[20] JX 79.

4

On January 12, 2018, Miller filed a Verified Petition for Judicial Dissolution of Jeffco, asserting that he and Tabak were hopelessly deadlocked on the management of Jeffco. Tabak initially did not oppose dissolution,[21] and the court granted a Decree of Judicial Dissolution on March 26, 2018.[22] In addition to dissolving Jeffco, the Dissolution Order required the parties to "commence the disposition of Jeffco's assets and winding up of its affairs pursuant to Section 11 of Jeffco's LLC agreement."[23] The parties, however, failed to make any significant progress in winding up Jeffco.[24] Tabak then belatedly opposed dissolution, claiming it would "have adverse tax consequences" for Tabak and Miller.[25]

On November 29, 2018, Tabak sent Miller the first of many letters regarding Miller's alleged liability for MTAM's expenses. It stated: "As of November 30, 2018, you owe Miller Tabak + Co., LLC $51,280."[26] On December 4, 2018, Tabak sent Miller another letter informing Miller that Tabak had paid the Park Avenue rent

---

[21] Dkt. 13, Ex. B (Feb. 3, 2018 email from Tabak to Miller's counsel: "I am not fighting Mr. Miller's request for dissolution."); Dkt. 15 (May 22, 2018 letter from Tabak to the court: "I have not opposed the dissolution and have agreed to cooperate with petitioner and his counsel.").

[22] Dkt. 14 (the "Dissolution Order").

[23] *Id.* ¶¶ 1–2.

[24] *See* Dkts. 15, 17–19 (letters to the court from Tabak and from Miller's counsel).

[25] Dkt. 19 (Jan. 5, 2019 letter from Tabak to the court: "I therefore now object to the petitioner's move to dissolve Jeffco.").

[26] JX 1 at '002.

for MTAM and that Miller's liability for the expenses had grown to $52,526.50.[27]

Three days later, on December 7, 2018, after having received no response from Miller, Tabak again sent a letter and informed Miller that "I instructed Lois Torres [MTAM's bookkeeper] to take 50% of the most recent quarterly profit distribution (after payment to the four other partners) to begin to fund the distribution. The use of $13,421.08 reduced your current liability from $52,526.50 to $39,105.42."[28] Over the next several months, Tabak continued sending letters to Miller to inform Miller of his increasing liability due to Tabak covering the Park Avenue rent.[29] On March 19, 2019, Tabak informed Miller that he had instructed Torres to take another $6,273.62 from Miller's distribution to fund Miller's alleged deficit.[30] Thus, during the pendency of this proceeding, Tabak directly caused approximately $20,000 of what would have been Miller's Jeffco distributions to be diverted to Tabak.[31] The

---

[27] *Id.* at '003.

[28] *Id.* at '004.

[29] *Id.* at '005–08.

[30] *Id.* at '009.

[31] Tr. 124:6–125:10:

> Q: Am I right, sir, that the money that you instructed Lois Torres to redirect that would have gone to Jeffrey Miller instead went to reduce his claimed liability?
> A: That's correct.
> Q: Without his consent?
> A: That's correct.
> . . .
> Q: Did any court say that you were entitled to the money you took from Mr. Miller?

6

second transfer actually occurred during the pendency of Miller's petition to appoint a receiver.[32]

On January 22, 2019, Miller filed a motion requesting that the court appoint an independent receiver to wind up Jeffco. Among the grounds for the motion were Tabak's diversion of Miller's Jeffco distributions.[33] On March 12, 2019, the court granted Miller's motion and entered an order (the "Receivership Order") appointing Jason Powell, Esquire as an independent receiver of Jeffco ("the Receiver"). The Receiver was given "full authority over the business and affairs of Jeffco."[34] The order directed the Receiver to confer with the Members and to submit a proposed plan of dissolution that would "provide for the prompt distribution of Jeffco's assets and the winding up of its affairs."[35] The Receiver's plan of dissolution would be "subject to Court approval."[36] The Receivership Order did not otherwise provide detailed instructions or establish a standard of review for the Receiver's actions.

---

A: Well, I didn't take the money. The money went into [Miller Tabak + Co.]. I didn't take the money.

Q: Who controls the money at [Miller Tabak + Co.]? who gets the money at the end of the day at [Miller Tabak + Co.], on that side of the business? It's Jeffrey Tabak, isn't it?

A: That's correct.

[32] *See* Dkt. 26 (March 8, 2019 letter from Miller's counsel to the court).

[33] Dkt. 20 (Motion for Appointment of Receiver) at 2.

[34] Receivership Order ¶ 1. The Receivership Order is Dkt. 27.

[35] *Id.* ¶ 2.

[36] *Id.* ¶ 3.

7

The Receiver spent the next several months gathering and analyzing Jeffco's financial information, formulating a proposed Plan of Distribution, and corresponding with the Members about any issues regarding distribution. The Receiver retained the accounting firm of Dingle & Kane P.A. to review the parties' submissions and to provide guidance to the Receiver in making the determinations made in the Plan of Distribution.[37] The primary area of dispute among Tabak and Miller was Tabak's capital account in Jeffco. During the dissolution process, Tabak realized that the Company's tax returns and capital account statements reflected that Tabak's capital account was negative. Tabak then turned to Jeffco's accountant at Citrin Cooperman, Constantine Sophos, and convinced him to prepare a one-page, revised capital account statement, showing Tabak's capital account as positive.[38]

The Receiver did not agree with the newly revised capital account statement, and in June 2019, the Receiver informed the court that the dissolution plan would provide for an "in kind distribution of Jeffco's assets, per the LLC agreement."[39] On November 1, 2019, the Receiver filed a Motion to Approve Plan of Distribution and Dissolution for Jeffco Management, LLC and for Related Relief (the "Motion to Approve Plan"). The Receiver determined that "Jeffco is unsaleable/illiquid and any

---

[37] Dkt. 41 (Receiver's Report in Response to Tabak's Objections) ¶ 20.

[38] JX 16 at '096.

[39] Dkt. 34.

8

distribution of its assets to the Member(s) would involve an in-kind distribution."[40] The Receiver also determined that there are no outstanding liabilities or claims against Jeffco.[41] The Receiver found that "[t]he Capital Accounts, per the documents and information reviewed by the Receiver, indicate that Jeffrey Miller's Capital Account is positive, while Jeffrey Tabak's Capital Account is negative."[42] The LLC Agreement provides that, upon dissolution of Jeffco, "[t]he positive balance of each Member's Capital Account . . . shall be distributed to the Members, either in cash or in kind."[43] Pursuant to the LLC Agreement, the Receiver proposed to distribute all of Jeffco's assets in kind to Miller. *Id.*

On March 12, 2020, the court granted an Agreed Order to Approve Receiver's Motion to Approve Plan (the "Agreed Order"), which established procedures for finalizing the Receiver's Plan of Distribution.[44] As its title suggests, Tabak, Miller, and the Receiver agreed upon the terms of the Agreed Order.[45] The Agreed Order provided that "any written objection to the proposed dissolution of Jeffco, the Distribution Plan, or the distribution of Jeffco's assets as contemplated by the

---

[40] Motion to Approve Plan ¶ 4(g). The Motion to Approve Plan is Dkt. 35.

[41] *Id.* ¶ 9.

[42] *Id.* ¶ 11.

[43] LLC Agreement § 11.2(a)(ii).

[44] The Agreed Order is Dkt. 39.

[45] *See* Dkt. 38 (Letter from Receiver to the court stating the Agreed Order "incorporates revisions as a result of multiple discussions and negotiations").

9

proposed Distribution Plan, which any Member may have, must be served by the Member upon the Receiver [the 'Member Objection'].["][46]  Thereafter,

> [t]he Receiver shall promptly advise the Court of any such Member Objection, and shall submit to the Court a written report regarding the Receiver's investigation of the legal merit of any such Member Objection, and the Receiver's belief regarding the proper treatment and disposition of such Member Objection . . . .  The Members shall have twenty (20) days after delivery of the Receiver's report to them to file a reply or other motion with the Court concerning said Receiver's report, after which time the Court will proceed to adjudicate the treatment to be taken with respect to any such Member Objection at a Hearing to be held on [September 15], 2020.[47]

Tabak disagreed with the Receiver's findings and his plan to distribute all of Jeffco's assets to Miller.  Tabak sent his objections via a letter to the Receiver dated April 24, 2020 (the "Objections Letter").[48]  The Objections Letter raised the following objections:

- The Receiver did not have jurisdiction to interpret or apply the LLC Agreement, because such disputes are subject to compulsory arbitration.[49]

---

[46] *Id.* ¶ 5.

[47] *Id.* ¶ 6.

[48] The Objections Letter is JX 32.  The objections were untimely under the terms of the Agreed Order.  The Receiver informed Tabak's counsel, however, that he would not take the position that the objections should not be considered solely because of their untimeliness.  Tr. 272:1–273:15.

[49] Objections Letter at '169.

- The Receiver failed to interview Jeffco's accounting firm, Citrin Cooperman, and the Receiver ignored Citrin Cooperman's revisions to Tabak's capital account balance.[50]

- The Receiver failed to account for the approximately $68,000 that Tabak had advanced for operating expenses, which should have been treated as a claim against Jeffco, MTCO, and Miller jointly and severally, or, alternatively, a capital contribution.[51]

- Jeffco's sole asset, its managing membership interest in MTCO, is not illiquid and does not require in-kind distribution.[52]

- Jeffco, MTCO, and Miller were unjustly enriched by Tabak's time and effort spent while managing the business after Miller left in 2017.[53]

- The capital account balances were calculated using Jeffco's finances from 2017, when they should have been determined as of the liquidation date and included post-2017 adjustments.[54]

---

[50] *Id.* at '171. Relatedly, Tabak also took issue with the fact that the Receiver was not an accounting expert and did not identify what experts the Receiver consulted and what information the Receiver relied on to reach his conclusion. *Id.* at '170–71.

[51] *Id.* at '169–70.

[52] *Id.* at '170–71.

[53] *Id.* at '171.

[54] *Id.* at '171–72.

- The book value of Jeffco's assets was not adjusted upon certain events to conform to the assets' fair market value, which adjustment would have changed the capital account balances.[55]

Pursuant to the Agreed Order, the Receiver responded to Tabak's objections in a "Receiver's Report" filed with the court.[56]  Tabak and Miller each submitted a reply, and the court heard argument on September 15, 2020 (the "September 2020 Hearing").  At the hearing, the court requested supplemental briefing with regard to the standard of review, the Receiver's process, and whether Tabak was pursuing his demand that the whole dispute was subject to arbitration.

On January 28, 2021, the court issued a letter opinion (the "January 28 Letter Opinion").  *See In re Dissolution of Jeffco Mgmt., LLC*, 2021 WL 282634 (Del. Ch. Jan. 28, 2021).  The January 28 Letter Opinion confirmed that Tabak had withdrawn his objection that the matter must be arbitrated, and it provided the parties with initial guidance concerning the standard of review for the Receiver's determinations. Ultimately, the January 28 Letter Opinion concluded that certain of the Receiver's determinations were likely subject to *de novo* review, including the determinations that Tabak had no claim against Jeffco for advanced expenses and that Tabak's capital account balance was negative.  Because the court concluded that its review

---

[55] *Id.*

[56] Dkt. 35.

12

of those issues may turn on credibility determinations, the January 28 Letter Opinion directed that Tabak and Sophos should be permitted to testify at an evidentiary hearing. The documentary record, however, would not be reopened and would be limited to the evidence submitted to the Receiver.

On April 20, 2021, the court held a one-day evidentiary hearing (the April 2021 Hearing). Tabak and Sophos testified. The court then heard oral argument from the Receiver, Miller's counsel, and Tabak's counsel. Following the hearing, Miller filed an application for an award of attorneys' fees and expenses, to which Tabak responded on May 19, 2021. This Memorandum Opinion resolves the parties' dispute over the Receiver's Motion to Approve Plan and Miller's application for attorneys' fees and expenses.

## II. ANALYSIS

### A. General Principles for the Standard of Review

The Receivership Order did not specify a standard of review for the Receiver's determinations. In the January 28 Letter Opinion, the court discussed the appropriate default standard of review, with reference to various statutes, Rules, and precedent. This Memorandum Opinion will reiterate some of that discussion here.

"[E]ach of the Receiver's challenged determinations should be analyzed independently," because "certain determinations may be subject to *de novo* review and other determinations may receive a deferential review, depending on the nature

of the determination." January 28 Letter Opinion, 2021 WL 282634, at *4.[57]

Determinations "as to claims and to accounts" will be subject to *de novo* review. *See*

Ct. Ch. R. 157; *see also B.E. Capital Mgmt. Fund LP v. Fund.com Inc.*, 171 A.3d

140 (Del. Ch. 2017) (applying *de novo* review to a receiver's disallowance of a

creditor's claim). On the other hand, a more deferential standard will apply where

"the receiver . . . has exercised the powers that otherwise would rest with the board

of directors [or managers]." *B.E. Capital*, 171 A.3d at 146; *see also* 6 *Del. C.* § 18-

805 (authorizing a receiver to "do all other acts *which might be done by the limited*

*liability company . . .* that may be necessary for the final settlement of the unfinished

business") (emphasis added).[58] For those decisions, this Memorandum Opinion

---

[57] *See In re 14 Realty Corp.*, 2009 WL 2490902, at *7–13 (Del. Ch. Aug. 4, 2009) (considering separately three discrete determinations made by a Trustee); *Badii ex rel. Badii v. Metro. Hospice, Inc.*, 2012 WL 764961, at *11 (Del. Ch. Mar. 12, 2012) (appointing a receiver and directing the receiver to exercise independent business judgment to settle a federal tax liability but to make recommendations to the court to resolve creditor and shareholder claims).

[58] *See In re First Woburn Bancorp., Inc.*, 1999 WL 33318823, at *1 (Del. Ch. Oct. 5, 1999) (receiver's decision to seek agreement with I.R.S. was "entitled to the protective presumption of the business judgment rule in the absence of any persuasive evidence of bad faith, self-dealing, gross negligence, or any other reason justifying removal of that protection"); *14 Realty Corp.*, 2009 WL 2490902, at *4 n.3 ("[D]e novo review of the determinations of a skilled and experienced trustee is duplicative and wasteful of judicial resources and parties' time and money. Were the standard of review closer to a business judgment standard—as it should have been—this motion could have been decided far more expeditiously and efficiently on the basis of the Trustee's well-reasoned determinations."); *Acela Investments LLC v. DiFalco*, 2020 WL 1987093, at *7 (Del. Ch. Apr. 27, 2020) ("[The Trustee] is indisputably independent and has no personal financial interest in the outcome of the sale process. He also possesses invaluable knowledge and insight gained over the past ten months of his tenure as Liquidating Trustee concerning, among other things, the Company's operations and finances as well as the capabilities of

14

adopts the court's guidance in *B.E. Capital*: "[T]he standard of review [for a receiver's decision] should be at least as deferential as the standard that would apply to the board's [or managers'] decision in the same context." *B.E. Capital*, 171 A.3d at 146. That is particularly the case here, where the Receiver was expressly given "full authority over the business and affairs of Jeffco."[59]

## B.    Tabak's Objections

### 1.    The Capital Account Balance

The Receiver determined that Miller had a capital account balance of positive $172,944 and that Tabak had a capital account balance of negative $652,237.[60] The Receiver arrived at this conclusion because these figures are the balances reflected in Jeffco's 2017 tax return, the last available tax return at the time of his appointment. Tabak contends that the tax returns show an incorrect capital account balance because they do not reflect $1.4 million in capital contributions that he made in 2013 and 2014. To corroborate his assertion, Tabak submitted to the Receiver a letter from Sophos, along with supporting documentation, which purports to show that Tabak's capital account balance was *positive* $401,746 at the end of 2017 (the

---

its stakeholders. It is for such reasons that this court routinely applies a deferential standard of review when the action of an agent of the court is challenged . . . .").

[59] Receivership Order ¶ 1.

[60] Motion to Approve Plan, Ex. B.

15

"Revised Balance"). Tabak objects to the Receiver's decision to not credit the Revised Balance and to use the negative balance from the tax return instead.

### a. Standard of Review for the Capital Account Balance

I conclude that the Receiver's decision to disregard the Revised Balance is subject to *de novo* review. The LLC Agreement contains detailed provisions for how to treat capital contributions and distributions and how to otherwise calculate the Members' capital accounts.[61] The adherence to these provisions is not subject to a manager's business judgment. Although a manager would have some leeway when applying certain accounting standards,[62] the ability to selectively exclude significant capital contributions from one Member's capital account is outside the scope of that discretion.

Furthermore, the Court of Chancery Rules suggest that an exception to a Receiver's determination of an account should be afforded a hearing. "At the hearing of exceptions to claims and to *accounts*, the testimony of witnesses shall be taken in the same manner as is provided for in other causes pending in this Court." Ct. Ch. R. 157 (emphasis added). As previously discussed, this court has construed the reference to a hearing in Rule 157 to permit *de novo* review. January 28 Letter Opinion, 2021 WL 282634, at *2. Absent a standard of review specified in the

---

[61] *See* LLC Agreement §§ 6, 7, 8.

[62] *Id.* § 5.4 ("All decisions as to accounting matters shall be made by the Members.").

16

Receivership Order, this court will not merely defer to the Receiver's computation of the account balance without giving the exceptant an opportunity to be heard, and review of the Receiver's conclusion regarding Tabak's capital account balance will be *de novo*.[63]

### b.      Review of the Capital Account Balance

Jeffco's 2017 tax returns show that Tabak has a capital account balance of negative $652,237.[64] The tax returns were signed and filed under penalty of perjury. Although Miller was Jeffco's tax-matters partner and was principally responsible for preparing the returns, Tabak has received statements of his capital account balances on Form K-1s, and Tabak has never been denied access to Jeffco's tax returns.[65] Despite continuously possessing tax returns that showed him having a negative capital account balance every year from 2014 forward, Tabak never disputed the accuracy of that calculation prior to this proceeding. Even Citrin Cooperman, which has prepared Jeffco's tax returns since 2012, has not sought to amend the tax returns and has not indicated a need to do so.[66] Even after Tabak sent documents to Sophos that Tabak says reflect additional capital infusions, Sophos did not incorporate that

---

[63] It is possible for this "hearing" to be a review on the record. *See B.E. Capital*, 171 A.3d at 143.

[64] JX 60.

[65] Tr. 83:15–19; 114:5–8.

[66] Sophos testified he did not want to make any changes to the tax returns due to this litigation. Tr. 176:20–177:2.

17

information into the next year's tax returns.[67]  The tax returns are a reliable indicator of Tabak's capital account balance.

Tabak's assertion of the Revised Balance is unpersuasive and does not to undermine the reliability of the tax returns.  The increase in the Revised Balance primarily results from two sets of purported capital infusions: $850,000 of contributions in 2013 and a $300,000 subordinated loan.[68]  I address each component in turn.

### i.    The Alleged $850,000 Cash Infusion

The undisputed evidence shows that Tabak created the $850,000 discrepancy after Miller filed the petition for dissolution.  Tabak's supporting documentation for the capital infusions does not show capital contributions from Tabak to Jeffco.  The

---

[67] JX 60 (stating that Jeffco's 2018 tax returns, which were prepared by Sophos and filed in September 2019, show that Miller's year-end capital account balance is negative $613,399).

[68] The Revised Balance also reflects that Tabak made three capital infusions in 2014 totaling $250,000.  JX 16 at '096 (showing deposits of $50,000, $75,000, and $125,000 in August 2014).  Sophos testified that he believed that the 2014 deposits were properly listed on the Revised Balance.  Tr. 186:8–11 ("Based on my view of the 250,000, I think it should be [listed on the Revised Balance].");  *but see* Tr. 180:9–181:17 (Sophos explaining that he could not find the 2014 deposits on the general ledger, even though he would have expected them to be listed there).  The parties did not discuss the 2014 deposits in briefing, and they did not dwell on the 2014 deposits at the April 2021 Hearing.  In any event, as even Tabak's counsel acknowledged, the 2014 deposits alone are not weighty enough to flip Tabak's capital account balance from negative to positive.  Tr. 231:5–22 (Tabak's counsel arguing that, if the $850,000 capital contribution was discredited, then the 2014 deposits *plus* the subordinated loan would get Tabak within "spitting distance" of a positive capital account balance).

documentation consists of 2013 bank statements with various deposits hand-circled by Tabak.[69] The names associated with these deposits do not appear to bear any relationship to Tabak. At the April 2021 Hearing, Tabak testified that deposits from the various individuals into Jeffco in 2013 "were made from my accounts,"[70] but in a November 2018 email to Miller, Tabak said the funds represented "credits from the individuals from whom I borrowed funds and injected into [Jeffco]."[71] Tabak has not presented any evidence other than his self-interested testimony to suggest that they are his capital contributions, much less that they are his capital contributions that were not already credited to his capital account.

The Revised Balance was based only on information that was chosen by Tabak.[72] In his cover letter to the Receiver attaching the Revised Balance, Sophos declared that the revision was "based on documents provided to me by Jeffrey Tabak."[73] The cover letter did not indicate that Sophos or Citrin Cooperman had consulted any other information in arriving at the Revised Balance.[74] At the April

---

[69] JX 16 at '104–17.

[70] Tr. 81:10–14.

[71] JX 16 at '100.

[72] *See* JX 83 at '877 (December 12, 2018 email from Tabak to Sophos) ("In order to make your job easier in getting the correct figure for my capital position, I have aggregated all of the documents sent to you (but only including the relevant pages) over the past week.")

[73] JX 16 at '095.

[74] *Cf.* JX 83 at '877 (email from Tabak to Miller copying Sophos, stating: "Mr. Sophos is perfectly capable of analyzing the [purported capital infusions] without your input.").

2021 Hearing, Sophos testified that he calculated the Revised Balance because Tabak told him to do so and that the Revised Balance was based only on the documents that Tabak gave to him.[75]

> Q: [T]hese reports [] have $850,000 down as a capital contribution by Mr. Tabak; correct?
> A: Correct.
> Q: And that was done because Mr. Tabak directed you to do so, or asked you to do so? You tell me if my word choice is incorrect.
> A: Mr. Tabak told me to do so.[76]

Sophos acknowledged that he did not independently investigate the deposits, other than to check them against the general ledger.[77] Sophos further testified he could not verify whether the 2013 deposits should be credited as additional capital contributions and that he would need more information, such as an explanation of the names on the transactions and a better understanding of the general ledger.[78] At the conclusion of his direct examination, when asked whether he stood by the inclusion of the $850,000 in the Revised Balance, Sophos testified that he was not

---

[75] Tr. 196:18–197:8.

[76] Tr. 196:10–17.

[77] Tr. 199:11–200:18; Tr. 209:11–17.

[78] Tr. 186:8–13 (Q: "So should [the $850,000] be listed here or not, based on what you have reviewed?" A: ". . . I just don't know. I'm just not definitive on it. I need more information."); *see also* Tr. 181:14–17; Tr. 183:11–18. The Agreed Order permitted the parties to take discovery, but they did not do so.

sure.[79]  Not only was Sophos unsure, but he previously told Tabak that he was

unsure.[80]  Both of those revelations appeared to come as a shock to Tabak's counsel:

> [I]f I thought that [Sophos] was going to come in and say he wasn't sure about the $850[,000], I wouldn't have allowed him to testify. . . .  So again, out of respect for the Court, I was very concerned when I heard him say that about the [$850,000] because it's not consistent with what at least I had been told.  What he might have privately discussed with Mr. Tabak, I can't speak to.  But it's upsetting to me because, obviously, time and effort has been spent on that point.[81]

Contemporaneous financial records validate Tabak's capital account balance as reflected in the tax returns.  Jeffco maintained capital account statements for the Members, which were prepared by Charles Levine, the CFO of Miller Tabak + Co.[82]  The capital account statements show Tabak starting 2012 with a positive balance of $1,141,341.  Over the course of the year, Tabak withdrew $1,601,728, and he ended 2012 with a balance of negative $460,387.  In 2013, Tabak made contributions that totaled $758,344, and he ended 2013 with a positive balance of $297,957.21.  The tax returns similarly show that Tabak started 2012 with a balance of $1,139,000.  The tax returns, however, show that Tabak withdrew only $649,342 during 2012 and

---

[79] Tr. 191:23–192:2 (Q: "As you sit here today, should the 850,000 be included or not? Do you stand on that, or are you not sure?"  A:  "I'm not sure.").

[80] Tr. 206:2–7 (Q:  "[A]m I correct, sir, that you told Mr. Tabak at some point while you were doing all this work that, 'Gosh, Mr. Tabak, I'm just not sure about that 850'?  You told him that, didn't you?"  A.  "I told him I wasn't sure about it.").

[81] Tr. 237:4–10; *see also* Tr. 236:10–237:3.

[82] JX 85 at '887 (stipulated chart summarizing the capital account statements and the tax returns in 2012 and 2013).

finished the year with a balance of $489,658. But the tax returns also identify a "due from member" asset in the amount of $950,045 arising in 2012. For 2013, the tax returns show Tabak making net withdrawals of $192,959. The tax returns also indicate that the $950,045 "due from member" asset was taken off the books in 2013. The tax returns then show Tabak's final balance at the end of 2013 to be $296,699.[83]

To summarize the preceding paragraph, (i) the tax returns and the capital account statements have substantially identical balances for Tabak at the beginning of 2012; (ii) the difference between the changes to Tabak's capital account according to the account statements versus the tax returns for 2012 is $952,386; (iii) the difference between the changes to Tabak's capital account according to the account statements versus the tax returns for 2013 is $951,303; (iv) the amount of the 2012 loan given to a Member that appears on the tax returns but not the spreadsheet is $950,045; (v) the 2012 loan was apparently repaid in 2013; and (vi) the tax returns and capital account statements have substantially identical balances for Tabak at the end of 2013. From these facts, I conclude that the tax returns accounted for the 2013 capital infusions that Tabak now alleges should have increased his capital account balance beyond what the tax returns currently reflect.

---

[83] *Id.* at '888.

### ii.          The Subordinated Loan

On July 31, 2013, Tabak made a subordinated loan to Miller Tabak + Co. in the amount of $300,000 (the "Subordinated Loan").[84]  Because Miller Tabak + Co. was a FINRA-registered business, FINRA approved the Subordinated Loan on August 1, 2013.[85]  The note was payable on July 31, 2014,[86] but there is no evidence that the note was ever repaid.  Tabak argues that, with interest, the amount owed on the Subordinated Loan is now $380,000.[87]

Tabak's argument regarding the accounting treatment of the Subordinated Loan has been a moving target.  Sophos's Revised Balance classified the Subordinated Loan as a Jeffco capital contribution.  At the September 2020 Hearing, however, Tabak insisted that the Subordinated Loan was not a capital contribution, but, in fact, a loan.[88]  At the April 2021 Hearing, Tabak took a more noncommittal

---

[84] JX 81.

[85] Tr. 96:16–97:12; JX 16 at '107.

[86] JX 16 at '107; JX 81.

[87] September 2020 Hr'g Tr. 28:10–11.

[88] *Id.* 28:4–10 ("[T]he subordinated loan that Mr. Tabak made, that we're saying that Citrin Cooperman said [Tabak] did not get credit for . . . as capital, isn't capital at all but, rather, is a straight loan that's documented, as required by FINRA as regulatory capital for $300,000 with interest."); *id.* 35:2–13 (arguing that Tabak's capital account is still positive "even if you deduct that $300,000 . . . and treat it as straight-up debt that has priority . . . separate and apart from capital"); *id.* 29:13–23 ("[The tax returns] plainly show an over $300,000 loan that's owed to Mr. Tabak that would get priority. . . .").

23

approach, refusing to say whether the $300,000 was a loan or capital contribution and, instead, deferring to Sophos's determination.[89]

Sophos was unaware that Tabak had previously insisted that the loan was not a capital contribution.[90] Sophos testified that he classified the subordinated loan as a capital contribution because it was unlikely to be repaid.[91] Tabak has not presented a persuasive reason for why the Subordinated Loan that Tabak made to Miller Tabak + Co. should count as a capital contribution to Jeffco.[92] Tabak admitted that "[t]he $300,000 loan was a subordinated loan from [Tabak] to Miller Tabak + Co."[93] and that Jeffco was not directly involved in that transaction.[94] Regardless, the $300,000 capital contribution is not large enough to overcome Tabak's $652,000 capital account deficit; thus, the Receiver's conclusion would have been the same even if

---

[89] Tr. 82:21–83:1; Tr. 95:22–96:6. Tabak's shifting position seems to have been tactical. He was willing to have the loan classified as a capital contribution if the result would be that his capital account were positive, thus avoiding an in-kind distribution of Jeffco's assets to Miller. But if classifying the loan as a capital contribution did not result in a positive capital account, Tabak wanted the ability to seek to recover the full amount of the loan, with interest, from Jeffco or Miller personally. Because Tabak's Objection Letter did not assert that the Subordinated Loan was a Jeffco liability as opposed to a capital contribution, he was barred from doing so. *See* January 2021 Letter Opinion, 2021 WL 282734, at *4 n.5.

[90] JX 16 at '096; Tr. 200:24—201:12.

[91] Tr. 182:15–183:2, 200:19–23.

[92] Tabak testified that Miller Tabak + Co. "immediately transferred" the $300,000 to Jeffco, but he provided no documentary evidence or compelling reason to disregard their distinct corporate entities. Tr. 97:13–18.

[93] Tr. 96:16–19.

[94] Tr. 97:13—98:2.

the Subordinated Loan counted as a capital contribution to Jeffco. The Subordinated Loan thus provides no basis for rejecting the Receiver's determination that Tabak's capital account balance is negative.

Upon a *de novo* review of the record and hearing testimony from Tabak and Sophos, the court agrees with the Receiver's determination that Tabak has a negative capital account balance of $652,237.

### 2. Claim for Advanced Expenses

Tabak asserts that he has a claim against Jeffco for approximately $68,000 of MTAM operating expenses that Tabak advanced. Tabak argues that the Receiver was required to reimburse the expenses prior to making any distribution of Jeffco's assets. The Receiver disallowed Tabak's claim.

### a. Standard of Review for the Claim for Advanced Expenses

The Receiver's decision to disallow Tabak's claim for advanced expenses is subject to *de novo* review. *See B.E. Capital*, 171 A.3d at 146 (holding that a receiver's disallowance of a creditor's claim was subject to *de novo* review); Ct. Ch. R. 156–157 (providing for a hearing on exceptions as to claims). Furthermore, the LLC Agreement does not give a manager the power to exercise business judgment regarding expense reimbursement decisions.

> Any Member shall be entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. . . . Any reimbursement pursuant

25

hereto shall be treated as an expenditure of the Company and shall not be treated as a Distribution to the reimbursed Member.[95]

If Tabak's expense payments meet the contractual conditions of the LLC Agreement, then the Receiver has the obligation to reimburse Tabak. The due reimbursement would be a liability "other than on account of [Tabak's] interests in the Company capital or profits," requiring it to be paid prior to any distributions upon liquidation.[96] The Receiver's determination that Tabak does not have a valid claim for reimbursement will be reviewed *de novo*.

### b.  Review of the Claim for Advanced Expenses

Tabak does not have a claim against Jeffco for reimbursement of advanced expenses. The operating expenses in question were incurred by MTAM. According to Tabak, MTCO agreed to cover MTAM's expenses.[97] When the funds that passed through from MTAM to MTCO became insufficient to cover MTAM's expenses, Tabak voluntarily paid MTAM's expenses out of the funds in Miller Tabak + Co., which Tabak had contributed from his commissions as a securities broker.[98] The demand letters that Tabak sent to Miller were sent on Miller Tabak + Co. letterhead and asserted that Miller personally owed the specified amounts to Miller Tabak +

---

[95] LLC Agreement § 4.5.

[96] *Id.* § 11.2(a).

[97] Tr. 16:18–17:2.

[98] Tr. 22:7–15; Tr. 40:18–41:19.

Co.[99]  Tabak told the Receiver that the monthly letters tallying Miller's growing liability represented Miller's "*pro rata* liability *to MTCO* for the failure to pay his portion" of the MTCO expenses.[100]  Tabak did not indicate that Jeffco had any obligation to pay those expenses.

Tabak testified that "[Miller] is responsible for 50 percent of the expenses that MTCO needs to pay for [MTAM] expenses."[101]  Tabak also argues that Miller is responsible for MTCO and MTAM expenses under an unwritten "expense sharing arrangement that presently exists between MTAM and MTCO/Jeff Miller/Jeff Tabak."[102]  Jeffco is not a party to this unwritten expense sharing arrangement, and Tabak acknowledged that he did not claim it involved Jeffco.[103]  There is no persuasive evidence that Jeffco was contractually obligated to pay MTAM's expenses or MTCO's liabilities.  There is also no allegation that Tabak paid

---

[99] *E.g.*, JX 1 at '002.

[100] JX 57 at '502 (emphasis added); *see also* JX 2 at '023 ("Miller has failed to meet any of his expense obligations of MTCO . . . .  I have sent Miller seven letters . . . indicating his expense liability to MTCO and requesting payment.").

[101] Tr. 116:7–9; *see also* Tr. 117:13–16 (Q: "[Y]ou're claiming that you have advanced Mr. Miller's share of MTCO/MTAM expenses?"  A:  "Yes.").

[102] JX 54 at '491.

[103] Tr. 129:23–130:3 (Q:  "So when [Tabak's counsel's email to the Receiver] is describing the expense sharing agreement, he doesn't say that Jeffco agreed to share any bit of that expense, does he, sir?"  A:  "No.").

MTAM's expenses *on behalf of Jeffco*.[104]  Tabak made a broad, unsupported assertion that Jeffco, MTAM, MTCO and Miller Tabak + Co. were essentially one entity.[105]  But Tabak made no legal argument to support ignoring the corporate form of any of these entities or piercing the corporate veil.[106]  Thus, the Receiver, who was tasked with dissolving and winding-up the affairs of Jeffco and not some other entity, was correct to deny Tabak's claim against Jeffco for advanced expenses.

### 3.    In-Kind Distribution

The Receiver determined that "Jeffco is unsaleable/illiquid and any distribution of its assets to the Member(s) would involve an in-kind distribution."[107]  Tabak argues that Jeffco is not unsaleable or illiquid and that the Receiver could have instead sold Jeffco's majority ownership interest in MTCO and distributed the proceeds.[108]

---

[104] LLC Agreement § 4.5 ("Any Member shall be entitled to reimbursement from the Company of all *expenses of the Company* reasonably incurred and paid by such Member *on behalf of the Company*." (emphases added)).

[105] Tr. 116:15–17 ("I'm not going to get caught up in the legalese.  These companies are all intertwined in ownership.").

[106] *See Gadsden v. Home Preservation Co., Inc.*, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004) ("A Delaware court will not lightly disregard a corporation's jural identity.  Absent sufficient cause the separate legal existence of a corporation will not be disturbed."); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors.").

[107] Receiver's Motion to Approve Plan ¶ 4(g).

[108] Objections Letter at '170–71.

### a. Standard of Review for the In-Kind Distribution

The Receivership Order appointed the Receiver to wind-up the affairs of Jeffco. No other court order, statute, or provision of the LLC Agreement required the Receiver to sell Jeffco's assets or prohibited the Receiver from distributing Jeffco's assets in kind. Just as a manager of Jeffco would have received a deferential standard of review in exercising business judgment as to the most preferable wind-up method under these circumstances, the Receiver's determination to make an in-kind distribution should receive similar deference.

Section 11.2 of the LLC Agreement expressly permits Jeffco's Members to make an in-kind distribution of assets upon liquidation. Upon dissolution, "[t]he positive balance of each Member's Capital Account . . . shall be distributed to the Members, either in cash or in kind, as determined by all Members . . . ."[109] Because the decision of whether to distribute assets in cash or in kind is left to the business judgment of the Members, it was likewise an exercise of business judgment for the Receiver. *See B.E. Capital*, 171 A.3d at 146; January 28 Letter Opinion, 2021 WL 282634, at *3–4. As such, the Receiver's decision is afforded the deference of the business judgment rule. "[W]here business judgment presumptions are applicable,

---

[109] LLC Agreement § 11.2(a)(ii); *see also id.* § 11.2(a) ("If the Company is dissolved and its affairs are to be wound up, the Members shall . . . sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Members in kind) . . . .").

the [Receiver's] decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

#### b. Review of the In-Kind Distribution

Tabak has not shown that the Receiver's decision to distribute the assets in kind was anything other than a good-faith exercise of business judgment. Tabak does not allege that the Receiver was self-interested in this regard; instead, Tabak argues that the Receiver's process was flawed because he did not make a serious attempt to sell Jeffco's assets. That alleged flaw does not overcome the Receiver's protection of the business judgment rule. The Receiver relied on the parties' submissions, and both Members, including Tabak, expressed the view that a sale of Jeffco's ownership interest in MTCO would be unlikely, due to difficulties with the executive who runs MTAM's day-to-day operations.[110] Tabak offered no evidence that anyone was interested in acquiring MTCO at any time following the appointment of the Receiver. The Receiver was justified in not further conducting a sale process, which would have entailed additional expenses for which Jeffco had

---

[110] JX 2 (letter from Tabak to the Receiver dated March 25, 2019) at '023 ("We have had two serious buyers interested in the assets of MTAM but both transaction[s] failed during due diligence. Ultimately, each potential buyer concluded that Michael Pietronico, the COO and a 25% owner of MTAM (and who runs the business day-to-day) was recalcitrant and would have difficulty aligning himself with the corporate cultures of the respective buyers. In short, Pietronico sabotaged both deals."); *see also* Tr. 55:11–56:1 (describing further the two failed sale processes).

no funds to pay.[111]  The Receiver was not required to make distributions in cash, and his decision not to sell Jeffco's assets, which the Jeffco LLC Agreement expressly authorized, does not warrant rejection of the Receiver's Plan of Distribution.

Even if the Receiver's decision on an in-kind distribution is afforded no deference, I would not have required a sale of assets, because (1) Jeffco did not have funds to conduct a sale process and (2) Tabak acknowledged that prior efforts to sell MTAM were fruitless.  The LLC Agreement expressly permits an in-kind distribution, and it is appropriate here.

### 4.    Failure to Perform Valuation and Adjustment

In deciding to distribute the assets in kind in proportion to the Members' positive capital account balances, the Receiver did not appraise the value of Jeffco's assets, which consisted of the 88.12% ownership interest in MTCO.  Tabak argues that the Receiver's calculation of the capital account balances "is fatally flawed in that it is absolutely necessary, under both the terms of the Jeffco LLC Agreement . . . as well as pursuant to well understood tax and accounting principles and common business knowledge, that Jeffco's book capital accounts need to be analyzed and adjusted."[112]  Tabak also argues that "the overall fair market valuation of Jeffco's

---

[111] September 2020 Hr'g Tr. 13:12–13.

[112] Objections Letter at '171.

business and its assets need to be determined and valued as of the liquidation date (and not based on 2016 or 2017 numbers)."[113]

### a. Standard of Review for the Lack of an Appraisal

Despite his broad objection, Tabak does not cite any authority other than the LLC Agreement to support the proposition that the Receiver was required to perform a valuation or adjustment. Section 1.16 of the LLC Agreement provides:

> [I]f all Members reasonably determine that an adjustment is necessary or appropriate to reflect the relative economic interests of the Members, the Gross Asset Value of all Company assets shall be adjusted . . . to equal their respective gross fair market values, without reduction in liabilities, as reasonably determined by the Members, as of the following times: (a) a Capital Contribution . . . to the Company by a new or existing Member as consideration for an interest in the Company; or (b) the distribution by the Company to a Member . . . as consideration for the redemption of an interest in the Company; or (c) the liquidation of the Company . . . .[114]

Section 6.3 addresses how an adjustment of Gross Asset Value could affect the Member's capital account balances.

> In the event the Gross Asset Value of Company assets is adjusted under Section 1.16 . . . the Capital Accounts of the Members shall be adjusted to reflect the aggregate net adjustment as if the Company recognized Net Profits or Net Losses equal to the amount of such aggregate net adjustment and such Net Profits or Net Losses were allocated to the Members.[115]

---

[113] *Id.*

[114] LLC Agreement § 1.16(ii).

[115] *Id.* § 6.3(b).

Tabak argues that contributions or distributions occurred without these provisions of the LLC Agreement being followed. Thus, according to Tabak, the Receiver is now required to perform a valuation and then adjust the Members' capital account balances pursuant to the LLC Agreement.

Even accepting Tabak's argument that there were distributions or contributions, Tabak's theory fails because these provisions of the LLC Agreement are not mandatory. Section 1.16 provides for an adjustment "if all Members reasonably determine that an adjustment is necessary or appropriate." Adjustment of Gross Asset Value is thus optional, subject to the business judgment of Jeffco's managers. The LLC Agreement does not mandate that the Receiver, or the Members that he replaced as the effective manager of Jeffco, always perform a valuation and adjustment of Jeffco's assets whenever there is a capital contribution or capital distribution. If a valuation is not made, a readjustment of the capital account balances is not triggered. The Receiver's determination as to the capital account balances cannot be invalidated based solely on a failure to perform a valuation under Section 1.16 of the LLC Agreement.

For similar reasons, a revaluation upon liquidation is not mandatory. In addition to Section 1.16, discussed above, Section 11.2 addresses a valuation upon liquidation, when the assets are being distributed in kind: "If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of

the date of dissolution shall be determined by independent appraisal or by agreement of all Members."[116]  Like Section 1.16, Section 11.2 is also discretionary.  The LLC Agreement permits the Members to obtain an independent appraisal, but it does not require them to do so.  When the Receiver took over the management of the Company, he had the power to determine the value of the assets.  His power was not unbounded; the Receiver's decision still needed to be a valid exercise of business judgment.  But the Receiver's determination to not obtain an independent appraisal is afforded a deferential standard of review.

### b.    Review of the Lack of an Appraisal

The Receiver's decision to forgo an independent appraisal of Jeffco's assets does not warrant rejection of the Plan of Distribution.  There is no allegation that the Receiver was somehow conflicted, and the Receiver's process was sufficient to satisfy a deferential standard of review.  The Receiver looked into having an appraisal performed, and he determined that an appraisal of Jeffco would cost at least $15,000, perhaps far more.[117]  A valuation of Jeffco's assets would likely have necessitated appraisal of MTCO and MTAM, further increasing the costs.  The Receiver elected to not hire an appraiser because (1) Jeffco had no funds to do so and (2) none of the Members raised an issue about the lack of an appraisal until after

---

[116] LLC Agreement § 11.2(a)(i).

[117] September 2020 Hr'g Tr. 13:7–11.

the Receiver's determinations were made.[118]  The Receiver was right to consider, as Tabak put it, "the low dollar value in controversy relative to the disproportionate cost of litigation."[119]

The Receiver reasonably felt that a valuation and corresponding adjustment to the capital account balances would not overcome Tabak's large capital account deficit.  The LLC Agreement provides for liquidation distributions in accordance with "[t]he positive balance of each Member's Capital Account."[120]  Because Tabak's capital account was negative, the valuation process would have been futile, and the law does not require the doing of a futile act.[121]

Likewise, the Receiver did not commit reversible error by using the 2017 tax returns to determine the Members' capital account balances.  Tabak has not presented any authority that would require the Receiver to re-calculate the capital account balances on the very day this court approves the Receiver's Plan of Distribution.  Such a requirement would be unworkable, making it impractical for the Receiver to propose a definite plan for this court to consider.  In this case, the

---

[118] September 2020 Hr'g Tr. 13:12–16; *see also* JX 2 (Mar. 25, 2019 letter from Tabak to the Receiver) at '022 ("[U]pon the dissolution of Jeffco, the assets of [Miller Tabak + Co.] and MTAM will become worthless.").

[119] Tabak's Supp. Memo. (Dkt. 53) 4.

[120] LLC Agreement § 11.2(a)(ii).

[121] *Reserves Dev. LLC v. R.T Props., L.L.C.*, 2011 WL 4639817, at *7 (Del. Super. Ct. Sept. 22, 2011) ("An overriding truth is that the law does not require a futile act.").

Receiver's decision to rely on the 2017 tax return was reasonable. The 2017 tax return, filed in September 2018, was the latest return prepared at the time that Receiver was appointed. Similarly, the 2018 tax return filed in September 2019 also showed Tabak with a negative capital account of more than $600,000.[122] Tabak presented no credible evidence to suggest that his capital account would be positive at any time after December 31, 2017.[123]

### 5. Tabak's Claim for Unjust Enrichment

In his Objections Letter, Tabak argues that he has a claim against Jeffco, MTCO, and Miller, jointly and severally, for unjust enrichment.[124] Tabak contends that he was not compensated for the time he spent managing Jeffco's affairs after Miller left the business, and that the value of his time should be considered either a claim against Jeffco or a contribution of capital into Jeffco. After the Receiver and Miller contested this objection in their responses, Tabak did not address the unjust enrichment claim in his reply. Tabak's objection did not place a dollar value on his

---

[122] JX 60 at '582 (showing Tabak with a negative capital account balance of $613,399 in Jeffco's 2018 tax return).

[123] At the April 21 hearing, Tabak tried to present a corrected Revised Balance through Sophos. *See* JX 82. Tabak contended that recently minted document would show that his capital account balance was even larger than Sophos had previously stated in the Revised Balance. I denied Tabak's last minute attempt to present new evidence. Tr. 170:1–6. Even so, Tabak's counsel admitted during argument that if the $850,000 in alleged capital contributions is rejected, which it is, Tabak's capital account would be negative even under the corrected Revised Balance (and that would be if the $300,000 subordinated loan were credited as a capital contribution). Tr. 231:17–24 (Nealon).

[124] Objections Letter at '171.

36

claim of unjust enrichment and did not attempt to document it. The only further reference to this objection was a brief line of questioning at the April 2021 Hearing, where Tabak testified that he spent approximately one hour per week managing "Jeffco or its affiliated entities" since Miller left the business in 2017 and that Tabak would value his time at $250 per hour.[125] In his argument, however, Tabak's counsel appeared to have abandoned this claim.[126]

Even if the objection has not been abandoned, Tabak's claim for unjust enrichment does not justify rejecting the Receiver's Plan of Distribution. Tabak did not assert unjust enrichment in a petition or a complaint in any court and thus did not create a legal claim that the Receiver was obligated to recognize. In raising his objection, Tabak did not support his claim for unjust enrichment with any legal authority. Tabak's claim also lacks persuasive factual support. Tabak provides no documentary evidence of the amount of Jeffco's enrichment, or the amount of time that Tabak devoted to managing the affairs of Jeffco, a holding company, as opposed to one of its affiliated entities. I did not find Tabak's testimony credible. With regard to Tabak's assertion that his time should be treated as a capital infusion, he

---

[125] Tr. 53:23–54:13. Tabak testified this "comes out to, in-kind compensation that I think I'm owed, approximately $251,000." Tr. 54:11–13.

[126] Tr. 237:22—238:2 ("[T]here is no claim *per se* for $250,000. That's simply – it's not in our objection, it's not in our claim, Your Honor. It's just simply Mr. Tabak trying to indicate that he invested a lot into this.").

has not argued that he complied with the LLC Agreement's detailed provisions governing the contribution of capital,[127] and even the full value of his asserted contributions would not exceed the deficit in his capital account balance.[128] For these reasons, the Receiver's decision to disregard Tabak's claim for unjust enrichment in the proposed Plan of Distribution is approved. Even affording the Receiver's decision no deference, I would reach the same result.

## C. Fee Shifting and Allocation of the Receiver's Fees

Following the April 2021 Hearing, Miller filed a motion for fee shifting, in which Miller seeks an order requiring Tabak to pay: (1) Miller's attorneys' fees from December 2018 to the present, (2) the $20,000 that Tabak diverted from Miller's distributions, and (3) all fees and expenses incurred by the Receiver.[129]

Under the American Rule, each party is normally obligated to pay only his or her attorneys' fees, whatever the outcome of the litigation. *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015). Delaware courts recognize certain exceptions to the American Rule, including a bad faith exception. *Id.* "[W]hen a

---

[127] *See* LLC Agreement § 6.1 ("No Member shall be required or permitted to make any Capital Contributions to the Company . . . without the unanimous consent of the Members.").

[128] *Compare* Tr. 54:8–13 (Tabak asserting that his contribution of time was worth approximately $251,000), *with* JX 60 (Jeffco's 2018 tax return showing that Tabak had a capital account balance of negative $613,399).

[129] Dkt. 80 at 11.

litigant imposes unjustifiable costs on its adversary by bringing baseless claims or by improperly increasing the costs of litigation through other bad faith conduct, shifting fees helps to deter future misconduct and compensates the victim of that misconduct." *Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*, 117 A.3d 549, 559–60 (Del. 2015). "The bad faith exception applies only in extraordinary cases, and the party seeking to invoke that exception must demonstrate by clear evidence that the party from whom fees are sought acted in subjective bad faith." *Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) (internal quotations omitted). "Although Delaware courts have described the bad faith standard as 'subjective,' this court has shifted fees based on litigation conduct without launching a fact-intensive investigation into the offending party's state of mind." *Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *2 (Del. Ch. July 22, 2021).

"To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard." *Id.* at *1. Delaware courts have shifted fees where parties have unnecessarily prolonged or delayed litigation, falsified records, knowingly asserted frivolous claims, misled the court, altered testimony, or changed position on an issue. *RBC*, 129 A.3d at 877; *see also Pettry*, 2021 WL 3087027, at *1. Whether to shift fees is a matter of this court's discretion. *RBC*, 129 A.3d at 879.

Similarly, the allocation of the Receiver's fees and expenses is also a matter of this court's discretion:

> Just as the determination of the amount of a receiver's compensation is a matter within the discretion of the trial court, so too is a determination of who should bear the expenses associated with the receivership . . . . In the absence of statute, the receivership expenses may be adjudged against one or the other of the parties or apportioned between them in the discretion of the court.

*Longoria v. Somers*, 2019 WL 2270017, at *3 (Del. Ch. May 28, 2019) (quoting 75 C.J.S. Receivers §§ 364, 464, Westlaw (database updated June 2021)). "[S]uch expenses should in all cases, as between the parties, be ultimately adjudged on equitable principles." *Longoria*, 2019 WL 2270017, at *3.

"As a general rule, costs and expenses of a receivership, including compensation for the receiver, counsel fees, and obligations incurred by her in the discharge of her duties, constitute a first charge against the property or funds of the receivership." *Ferry v. Kehnast*, 2008 WL 2154861, at *4 (Del. Ch. May 6, 2008) (internal quotation and alterations omitted). The court may consider several factors when determining whether to depart from that general rule. One factor is whether the entity in receivership has sufficient funds to cover the receiver's fees and expenses. *See Brill v. Southerland*, 14 A.2d 408, 413 (Del. 1940) ("Where there is no fund out of which expenses can be paid, or the fund is insufficient, the usual rule is that the party at whose instance the receiver was appointed should be required to provide the means of payment."). Another factor is which party sought appointment

40

of the receiver. *Longoria*, 2019 WL 2270017, at *3 (imposing costs of receivership on the party seeking it); *Leslie v. Telephonics Office Techs., Inc.*, 1993 WL 547188, *13 (Del. Ch. Dec. 30, 1993) (same). An additional factor is whether one party's conduct necessitated the appointment of a Receiver. 75 C.J.S. Receivers § 364 ("It is a proper exercise of the discretion of the court to tax the costs against the party whose conduct created the necessity for a receiver."). The court may also shift the costs of the receivership to a party whose bad faith conduct has contributed to the receiver's increased expenses. *See GMF ELCM Fund L.P. v. ELCM HCRE GP LLC*, 2019 WL 1501553, at *5 (Del. Ch. Apr. 4, 2019) (requiring the individual defendant to pay the portion of the receiver's fees that were caused by his lack of cooperation with the receiver).

Some of Tabak's conduct is glaringly egregious, warranting a shifting of fees under the bad faith exception to the American Rule. First, Tabak resorted to self-help during this proceeding, contributing to the appointment of the Receiver. On December 7, 2018, Tabak redirected Miller's quarterly profit distribution—approximately $13,000—as a partial remedy for what Tabak claimed were expenses owed by Miller.[130] This conduct necessitated Miller's request for the appointment of the Receiver. In March 2019, while the receivership motion was pending, Tabak

---

[130] JX 1 at '004; Tr. 124:6–125:10.

41

again redirected approximately $7,000 from Miller's quarterly profit distribution for the same alleged claim.[131] Tabak admitted that he took these actions without authorization from Miller or any court.[132]

Second, Tabak manufactured a false narrative about the Revised Balance. Tabak's argument that he had made $850,000 in contributions to Jeffco that were not reflected as capital contributions on the Company's tax returns was a litigation construct. Tabak told Sophos to create a revised capital account statement based on carefully selected documents "to make [Sophos's] job easier in getting the correct figure for [Tabak's] capital position."[133] When Miller sought to provide context for Sophos, Tabak chided him, saying "Sophos is perfectly capable of analyzing the data without your input."[134] Tabak touted that Sophos's testimony would establish his claim. But what Tabak did not tell the court, or even his own counsel, is that Tabak directed Sophos to make that change to the capital accounts and that Sophos told Tabak that he was never sure that the $850,000 should be credited to Tabak's capital account.[135] Even Tabak's counsel, who had been blindsided by the testimony of his

---

[131] JX 1 at '009.

[132] Tr. 120:5–17.

[133] JX 83 at '877.

[134] *Id.*

[135] Tr. 205:17–206:7.

42

client's star witness, admitted his frustration over the issue, acknowledging that "it's upsetting to me because, obviously, time and effort has been spent on that point."[136]

Tabak took other dilatory and wasteful positions in these proceedings. For example, Tabak forced the Receiver to respond to Tabak's contention that the parties were required to move their dispute to arbitration despite having engaged in these proceedings for over two years, only then to abandon the argument.[137] In briefing Miller's application for fee shifting, Tabak submitted an opposition that read more like an unauthorized sur-reply to the merits of his objections to the Receiver's motion.[138] The 6,564-word opposition was more than double its permissible length.[139] The submission of unauthorized merits arguments—to which Miller's counsel had to respond—constitutes glaringly egregious conduct. To be sure, I have disregarded those arguments as to the merits of the dispute.

On the other hand, some of Tabak's actions were best categorized as "aggressive litigation positions." *See Pettry*, 2021 WL 3087027, at *2 ("[T]here is a fine line between glaringly egregious conduct and an aggressive litigation

---

[136] Tr. 236:3–237:10.

[137] Objections Letter at '169; Tabak's Supp. Memo. in Further Opposition to Receiver's Proposed Plan (Dkt. 53.) at 5.

[138] Dkt. 83; *see* Ct. Ch. R. 171(a) ("Unless otherwise ordered, no additional briefs or letters containing argument shall be filed without first procuring Court approval.").

[139] *See* Ct. Ch. R. 171(f)(1)(B) ("The opposition to the motion shall not exceed 3,000 words").

position."). For example, the Receiver's Plan of Distribution contained very little explanation for why the Receiver discredited Tabak's revised capital account balance calculation and why the Receiver denied Tabak's claim for reimbursement of expenses against Jeffco. Tabak was justified in objecting to the Receiver's Motion to Approve on these points and in demanding that the Receiver provide supporting evidence for his determinations. Furthermore, in July 2019, Tabak's counsel asked the Receiver to speak with Citrin Cooperman about the Revised Balance.[140] The Receiver told Tabak's counsel that he would "make arrangements for [his] professionals to speak to [Citrin] Cooperman," but that conversation apparently did not happen prior to the Receiver submitting the proposed Plan of Distribution.[141] That said, even after Tabak submitted the Objections Letter, the Receiver's process for substantiating his capital account balance determinations would have been much more abbreviated if Tabak has been more forthright about the supporting documentation behind the Revised Balance and about the fact that Sophos had told Tabak that he was unsure about accuracy of the Revised Balance.

---

[140] JX 19 at '123–24 (July 2, 2019 email from Tabak's counsel to the Receiver).

[141] JX 19 at '123 (July 11, 2019 email from the Receiver to Tabak's counsel) ("[Y]ou may alert [Citrin Cooperman] that I may be contacting them.").

The Company's funds are unlikely to cover the Receiver's fees and expenses.[142] Based on the conduct described above, and in the exercise of my discretion, I am shifting fees in the following manner: I am allocating all of the Receiver's fees and expenses to Tabak, and $20,000 of Miller's reasonable attorneys' fees and expenses will be charged to Tabak.

## III. Conclusion

For the foregoing reasons, the Receiver's Motion to Approve Plan of Distribution and Dissolution is granted, all of Tabak's objections are denied, and Miller's Motion for Fee Shifting is granted in part. The Receiver is directed to submit an affidavit or declaration pursuant to Court of Chancery Rule 88 within ten business days.

---

[142] *See* Tabak's Opposition to Miller's Motion for Fee Shifting (Dkt. 83) at 6 ("Upon information and belief, there is insufficient cash presently on account at Jeffco to even fully pay the Receiver's accrued priority expenses . . . .").